THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ LUIS LÓPEZ RIVERA, Defendant and Appellant.

Nos. CR-63-397 to CR-63-399.    Decided January 26, 1965.

*Augusto Burgos Mundo* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Irene Curbelo, Assistant Solicitor General,* for The People.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

Appellant was charged with three violations of § 29 of the Narcotics Act of Puerto Rico, 24 L.P.R.A. § 974z, consisting in possessing, concealing, transporting, and selling the drug known as heroin. He pleaded not guilty in each of the three counts and at the trial he was represented by two attorneys. He was found guilty in the three counts by unanimous jury verdict.

The transaction which gave rise to the information may be summed up as follows: On November 4, 1960, the informer, Antonio Reyes Ríos, and the undercover agent, Ibraím Mestre Sánchez, approached appellant and the former asked him to sell him some heroin. Appellant said that he did not have the drug on his person, that he had it in another place. The informer gave him $10 to get him two decks or small bags of heroin. Defendant then went to Puerta de Tierra housing project and returned with the heroin about 10 minutes later. The informer and agent Mestre waited for him

on the street near a car. On his return, appellant placed the two small bags of the drug in question on the rear right fender of the car. The informer took them and handed them to Mestre. Another undercover agent named Juan Santiago Meléndez, who had been asked to cooperate with Reyes and Mestre, was observing the transaction from a distance of about 15 feet.

In the prosecution of the case the two agents, Mestre Sánchez and Santiago Meléndez, were prosecution witnesses. Mestre having made reference to the existence of the informer, the defense requested to be informed the name and address of the latter "in order to duly cross-examine the witness who is on the witness stand [Mestre] and to prepare an adequate defense in this case for the benefit of our client." Upon questioning by the district attorney, witness Mestre testified that the informer's name was Antonio Reyes Ríos, and when the court asked him for the informer's address, Mestre answered: "Actually I have no knowledge of that." Thereupon the judge asked the district attorney whether he knew the address of informer Reyes Ríos and the district attorney answered that he did not.

At the commencement of the defense evidence one of defendant's attorneys announced that the defense theory would arise from the evidence.

The defendant was the first to testify. He said that he knew informer Antonio Reyes Ríos by sight; that in July 1960 he came across him on Pelayo Street of San Juan; that there Reyes Ríos offered to sell him a gold chain; that he asked $13 for it; and that he purchased it. Defendant also testified that about two weeks later he saw Reyes Ríos again; that the latter asked him $13 more alleging that the chain was worth $20;[1] that for that reason they engaged in an

---

[1] This appears at p. 55 of the record. At p. 64 defendant says that on that occasion Reyes Ríos asked him $7 more (instead of $20 as he said before).

argument and came to blows; that he saw Reyes Ríos again two or three times around there, but no further incidents occurred between them. Defendant also testified that he is not a drug addict and has never been a drug trafficker; that sometimes he works at the piers; that he is not unionized.

The second and last defense witness was Juan F. Casañas, a resident of Puerta de Tierra, who said that he knew defendant since the latter was a child; he said that defendant's reputation was very good; he denied knowing that defendant was called "El Lambío" and that he (the witness) is a friend of defendant's parents.

Appellant assigns the commission of only the following error:

"The trial court erred in denying defendant's request to be furnished with the information necessary to establish the identity of informer Antonio Reyes Ríos."

What is known as the "informer's privilege" is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to the authorities. *Roviaro* v. *United States*, 353 U.S. 53, 59 (1957); *Scher* v. *United States*, 305 U.S. 251, 254 (1938); *In re Quarles and Butler*, 158 U.S. 532 (1895); *Vogel* v. *Gruaz*, 110 U.S. 311, 316 (1884). The purpose of the privilege is the furtherance and protection of the public interest in fighting crime. The existence of the privilege is a judicial recognition of the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation. *Roviaro* v. *United States, supra*, p. 59. Undoubtedly, for that reason the Supreme Court of the United States has said that public policy forbids disclosure of an informer's identity unless essential to the defense. *Scher* v. *United States, supra.* See, also, *Segurola* v. *United States*, 16 F.2d 563, 565 (1926);

*Shore* v. *United States,* 49 F.2d 519, 522 (1931); *McInes* v. *United States,* 62 F.2d 180 (1932).

Another reason for not disclosing the informer's identity is a corollary of the first, already stated. The usefulness of the informer having been recognized in the always difficult task of protecting society from the underworld, the need for protecting the informers by not identifying them is also recognized, with the exception already noted when essential to the accused's defense. It is easy to understand that an identified informer runs personal risk. There have been cases in which identified informers have been murdered. *Draper* v. *United States,* 358 U.S. 307 (1959); *Brown* v. *United States,* 222 F.2d 293 (1955); *Schuster* v. *City of New York,* 154 N.E.2d 534 (1958).

Mr. Justice Clark, dissenting in *Roviaro, supra* at pp. 66–67, has stated as follows on the matter:

"It is well to remember that the illegal traffic in narcotic drugs poses a most serious social problem. One need only read the newspapers to gauge its enormity. No crime leads more directly to the commission of other offenses. Moreover, it is a most difficult crime to detect and prove. Because drugs come in small pills or powder and are readily packaged in capsules or glassine containers, they may be easily concealed. They can be carried on the person or even in the body crevasses where detection is almost impossible. Enforcement is, therefore, most difficult without the use of 'stool pigeons' or informants. Their use has long had the approval of the courts. To give them protection governments have always followed a policy of non-disclosure of their identities. Experience teaches that once this policy is relaxed—even though the informant be dead—its effectiveness is destroyed. Once an informant is known the drug traffickers are quick to retaliate. Dead men tell no tales."

Professor Wigmore states it as follows:

"A genuine privilege must be recognized for the identity of persons supplying the government with information concerning the commission of crimes. Communications of this kind ought to receive encouragement. They are discouraged if the

informer's identity is disclosed. Whether an informer is motivated by good citizenship, promise of leniency or prospect of pecuniary reward, he will usually condition his cooperation on an assurance of anonymity—to protect himself and his family from harm, to preclude adverse social reactions and to avoid the risk of defamation or malicious prosecution actions against him. The government also has an interest in nondisclosure of the identity of its informers. Law enforcement officers often depend upon professional informers to furnish them with a flow of information about criminal activities. Revelation of the dual role played by such persons ends their usefulness to the government and discourages others from entering into a like relationship." 8 Wigmore, Evidence, § 2374 (1961).

In addition to the authorities cited above, the following discussions on this matter may be consulted: Rosenthal, *"The Informer Privilege in Criminal Prosecutions,"* 11 Hastings L.J. 54 (1959); Sisson, *"Identification of Informer in Narcotic Sale Prosecution,"* 33 So. Calif. L. Rev. 344 (1960); Anno., 59 A.L.R. 1555, 1559; Anno., 9 A.L.R. 1099, 1112.

As may be seen from the foregoing discussion, the general rule on matter of informers is that, by reason of public policy, the courts recognize the Government's privilege to withhold disclosure of the informer. However, the important case of *Roviaro* v. *United States, supra,* establishes an exception to that rule, which exception has been called "participant-informer rule." The participant-informer, as the term denotes, is one who participates, who plays a part in the criminal act. He is thus distinguished from a mere informer who furnishes information to the authorities but plays no part in the transaction object of the offense. *People* v. *Lawrence,* 308 P.2d 821, 830 (1957); Sisson, *"Identification of Informer in Narcotic Sale Prosecution,"* 33 So. Calif. L. Rev. 344 (1960); Dubin, *"The Informer's Privilege Versus the Constitution: A Doctrinal Dilemma,"* 50 J. Crim. L., C.&P.S. 554 (1960); Rosenthal, *"The Informer Privilege in Criminal Prosecutions,"* 11 Hastings L.J. 54 (1959); Note, *"Dis-*

*closure of Identity of Informant,"* 26 Tenn. L. Rev. 308 (1959); Comment, *"Disclosure of Informers Who Might Establish the Accused's Innocence,"* 12 Stan. L. Rev. 256 (1959); Fry, *"Disclosure of Informer-Participant's Identity,"* 46 Calif. L. Rev. 467 (1958); Comment, *"Disclosure of Confidential Informant,"* 71 Harv. L. Rev. 111 (1957). In *Roviaro* the defendant was prosecuted for concealing, transporting and selling narcotics in violation of the law. Several public peace officers and an informer took part in the criminal act. Defendant sold the drug to the informer. Prior to the trial defendant requested to be informed of the name and address of the informer. The Government objected and the trial court sustained its denial. In reversing the judgment, the Supreme Court[2] said that "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."[3] But further on, at p. 62, the Court summed up the discussion of the matter saying:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."[4]

In other words, when the informer's privilege is invoked there arises a conflict between two equally important interests: the interest of the citizens and of the community in reducing criminality as much as possible by the deterrent effect of the punishment of violators of the law, and also

---

[2] Two of its Justices took no part and one dissented.

[3] 353 U.S. 60–61.

[4] 353 U.S. 62.

the interest of the citizens and of the community in not punishing any innocent person. In view of this situation, the Supreme Court of the United States seems to say, it is necessary to examine closely each particular case in order to impart justice. No fixed rule can be established which will free us from the "agony of decision" and decide our cases a priori. That, we believe, is the most sensible position but at the same time the most difficult. The last paragraph cited from the opinion of *Roviaro* says in fact: Proceed at your own risk. It has to be so. The courts cannot elude the duty to decide.

In view of the foregoing, we must now answer to ourselves these two questions: Is the situation in the case at bar the same as that in *Roviaro* and, accordingly, do we have to conclude that the error assigned was committed? If it is not, and having examined the particular circumstances of the case, which should be the result of balancing the interests in play here?

Answering the first question which we have posed to ourselves, we conclude that the cases are not the same. The pertinent differences are the following:

(1) In *Roviaro* a Government witness testified that when defendant was arrested and taken to police headquarters in Chicago and was confronted with the informer, the informer denied knowing defendant or ever having seen him before (pp. 58 and 64 *in fine*). In view of this situation, there is no question that it was important for defendant to know the name and address of the informer and to put him on the witness stand on his behalf. This circumstance is not present in the case at bar.

(2) In *Roviaro* the Government refused to identify the informer. It merely referred to him as "John Doe." This is not the situation in the case at bar in which the Government furnished his full name: Antonio Reyes Ríos. Neither witness Mestre nor the district attorney were able to give the address

because they did not have the information at that moment, but from a reading of the record it appears that they would have given it if they had had it. Was there any reason for withholding it if defendant knew the informer? This leads us to the third pertinent difference.

■ (3) In *Roviaro* defendant's position was that he did not know the informer—since the Government merely designated him as "John Doe"—and requested his name and address. In the case at bar defendant himself testified that he knew the informer. Several months prior to the criminal act, in July 1960, defendant purchased a chain from Reyes Ríos. Apparently Reyes Ríos lived in or went frequently to the neighborhood where defendant lived and operated—near Puerta de Tierra housing project—since defendant testified that after purchasing the chain he saw Reyes Ríos around there several times. In our opinion, the fact that defendant knew the informer, coupled with the other differences pointed out, distinguishes this case from that of *Roviaro*. It has been held that it is not a prejudicial error to refuse the identification requested if defendant knows it or has elicited it by other means. *People* v. *Lazzara*, 281 P.2d 4, 5 (1955); *Sorrentino* v. *United States*, 163 F.2d 627, 629 *in fine* (1947); *People* v. *McShann*, 330 P.2d 33, 36 (1958). For more federal cases, and of California, of Maryland, and of Massachusetts, see 8 Wigmore, Evidence 766, n. 6 (1961).

(4) In *Roviaro* defendant was alone with informer during the crucial moment. In the case at bar agent Mestre accompanied the informer during the transaction, was present thereat, testified at the trial, and was cross-examined by the defense. Furthermore, there was another eyewitness, agent Juan Santiago Meléndez, who also testified and was cross-examined.

(5) In *Roviaro* defendant requested before trial to be furnished the desired information. In the case at bar, when defendant requested the information at the trial and obtained

the informer's full name, coupled with the circumstance that defendant knew the informer, defendant failed to request time to summon or cause to summon the informer or to confer with him. He did not move for a continuance of the case, nor requested the court to summon informer Antonio Reyes Ríos. Neither did the defense inform the court in what sense the informer would testify if he were called to the witness stand.

(6) In *Roviaro* a discrepancy in the evidence as to whether the heroin had been found by police officer Bryson or by agent Durham reflected somewhat upon the credibility of agents Durham and Fields, two of the Government's principal witnesses.[5] Nothing similar occurred in the case at bar to cast doubt on the testimonies of the prosecution witnesses.

■ It has been written, we believe with good sense, that since fairness is the basis of the right to disclosure, it is submitted that the courts should adopt a balancing rule similar to that formulated in *Roviaro*. This approach would allow the question of disclosure to be determined by the merits of each case, and apparently would not require reversal where nondisclosure does not actually prejudice the defendant. In protecting defendant's right to a fair trial, says the author cited, the courts should not overlook fairness to the public and its interest in effective-law enforcement. Fry, work cited, 46 Calif. L. Rev. 471. See, also, Gustafson, *"Have We Created a Paradise for Criminals?"*, 30 So. Calif. L. Rev. 1 (1956).

■■ Pursuant to the paragraph cited above from the opinion in *Roviaro* containing the leading rule therein announced, bearing in mind the circumstances of this particular case, which we have stated; taking into consideration that the traffic of prohibited drugs is so harmful and perverse—

---

[5] "Although this discrepancy dealt with the relatively minor matter of who had first found the package, it also reflected upon the credibility of Durham and Fields, two of the Government's principal witnesses." 353 U.S. 64.

traffic which for gainful purposes destroys human lives—bearing in mind the strength of the evidence presented and other relevant factors; balancing the individual and social interests involved; and although in cases of participants-informers we would apply the rule of *Roviaro* in the sense of compelling the Government to disclose the name and address of the participants-informers whenever necessary to guarantee to defendant a fair trial, we hold that the error assigned was not committed in the case at bar.[6]

The judgments appealed from will be affirmed.

---

[6] On the informer's privilege, see Rule 215 of the Draft of the Rules of Evidence (of Puerto Rico) of 1958 and the history and comments appearing under that Rule. At the time that draft was prepared, the drafting committee did not find any decision of Puerto Rico on this matter. 3 *Práctica Forense Puertorriqueña* 177 (1964), Equity Publishing Corp.